IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

MICHAEL ARTHUR McGIFFIN #1320384   §

§      CIVIL ACTION NO. 6:07cv184

DR. HAROLD CLAYTON, ET AL.     §

MEMORANDUM OPINION AND ORDER OF DISMISSAL

The Plaintiff Michael McGiffin, proceeding *pro se*, filed this civil rights action under 42 U.S.C. §1983 complaining of alleged violations of his constitutional rights.  The parties have consented to allow the undersigned United States Magistrate Judge to enter final judgment in this proceeding pursuant to 28 U.S.C. §636(c).

An evidentiary hearing was conducted on October 16, 2007, pursuant to Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985).  At this hearing and in his complaint, McGiffin testified that prior to his arrival at the Beto I Unit, while he was at the Victoria County Jail, he was diagnosed by a physician named Dr. Kopecky as having "persistent dipuria and lower tract obstructive symptoms."  The physician recommended that McGiffin have urethra dilation three times per week, which McGiffin could do himself through the use of a tool which he would insert in his penis.  The county jail officials told him that he could not take the tool with him to TDCJ, but that they would send medical notes with him so that he could get another one.  At the Garza Unit, he was given a catheter which he could use in place of the tool.  At the Byrd Unit, the nurse said that she would talk to the physician's assistant, who refused to order a tool for him.

McGiffin arrived at the Beto I Unit between October 24 and November 14, 2005.  On November 14, he saw a physician's assistant named Virginia Buchanan.  She said that he needed to see a urologist and refused to order anything for him, and also said that the hospital in Galveston would not order anything for him.

1

A week later, McGiffin saw a physician named Dr. Clayton.  At this time, the doctor said that he knew that McGiffin was in a lot of pain, but that there was nothing that he could do for him except to get him in to see a urologist "very soon."  He promised McGiffin an appointment, but none was forthcoming.

McGiffin saw Buchanan in December of 2005 and January of 2006, telling her that he needed something done because the blockage was very bad.  She replied that UTMB was not going to give him anything to put in his penis, and she refused to order any type of urethral dilation.

In March of 2006, McGiffin says, he spoke to a physician in Galveston named Dr. Green, by video teleconference.  He told the doctor that he was in pain and had very slow urine flow, and Green said that he would see him in a week.  Three days later, McGiffin says that he asked Dr. Clayton for something with which to dilate himself, and Dr. Green said that he knew about the pain but could not order anything for him.

McGiffin went to the hospital in Galveston on April 12, 2006 and saw Dr. Green.  He told the doctor about the tool which Kopecky had ordered, and Green said that Kopecky was right, but that he, Green, did not have such a tool; he stated that he would order one and have McGiffin back in a week. Green did not dilate McGiffin's urethra, but just sent him back to the unit.

A few weeks later, McGiffin saw a physician's assistant, who ordered some pain medications.  McGiffin went into Dr. Clayton's office to complain that he had not returned to Galveston, and Clayton said that he would make a note to send McGiffin back.

On June 1, 2006, McGiffin saw William Kapela, a physician's assistant, who told him that there was no documentation that Green had done anything.  He said that he would email Green to find out what was going on.  McGiffin asked Kapela to dilate him, and Kapela told him to wait until they heard back from Dr. Green.

One week later, on June 8, Kapela told McGiffin that Green did not answer his email, and so he was going to order a #14 catheter, which McGiffin could use like the tool.  These were ordered, but during the last week in June, the unit was on lockdown, and he could not get out of his cell to

2

get them. On July 10, Kapela ordered a thermometer probe cover to be used in place of the tool. McGiffin said that he felt a sharp edge on the probe cover, but Kapela said that it would be all right to use it. McGiffin did so, and discovered that the probe cover did have sharp edges on it. It cut him inside and he complained to Kapela, who told him to trim the sharp edges off with a razor blade.

On August 9, 2006, McGiffin says, he returned to Galveston, and saw Dr. Tran. The doctor told McGiffin that Kapela had ordered a urethral dilation procedure and that he, McGiffin, had to sign a consent form. The procedure involved the use of nine rods, increasing in size, to dilate him. McGiffin said that Dr. Kopecky had advised him not to do this procedure because it would make the scar tissue larger and thereby make his situation worse, but Dr. Tran insisted. The procedure was done and McGiffin bled profusely. Dr. Tran ordered #14 catheters for McGiffin to use at the unit. McGiffin testified that Dr. Tran was an "innocent bystander," that he had simply done what Kapela had ordered.

On August 11, McGiffin says that Nurse Huff gave him a #15 catheter, rather than a #14 catheter, and did not order his antibiotic. He did not get any catheters until late in the day on August 14.

On September 17, 2006, McGiffin told Nurse Barnsley that he had been out of catheters for three days, and Barnsley gave him two #16 catheters. Tran had told him not to re-use a used catheter and not to use the probe cover, but Barnsley told him that he could wash the catheters and re-use them. When he ran out again, on September 26, Barnsley gave him one catheter, told him that he could wash it, and that the one catheter was all that he had. On October 20, McGiffin again received only one catheter and was told that he could wash it.

McGiffin testified that Tran ordered a tool, the same one he had in Victoria, and that Kapela had also ordered one, supposedly, but the supply lady said that she did not get the order. On October 27, he was notified that the tool had arrived, but when he got to the infirmary, Nurse Kale had an object which looked like a fish-hook. She told him that this was the tool which Kapela had ordered for him and that he was to use it, but McGiffin refused. When he returned to Galveston a

3

few days later, he showed the object to Tran, who said "please tell me you did not use this."  Tran told him that the object was for the prostate, not for urethral blockage, and that had he used it, he would have injured himself.  At the <u>Spears</u> hearing, McGiffin said that he did not want to sue Kale because she was simply carrying out Kapela's orders.

Nurse Barbara Hughes, a correctional nurse who was also present at the <u>Spears</u> hearing, stated that according to the medical records, McGiffin had been seen many times by medical personnel, including at the hospital in Galveston.  She stated that McGiffin has been issued catheters a number of times, and noted that the medical records included a notation about the thermometer probe cover, but could not tell anything about the tool.  She stated that at the Michael Unit, the medical staff issues catheters and Betadine with which to clean these catheters.

<u>McGiffin's Medical Records</u>

The Court has received and reviewed a copy of McGiffin's medical records.  These records show that on September 12, 2005, while he was at the Byrd Unit, McGiffin was seen by a nurse with a complaint that he is supposed to dilate his penis every two days.  He said that he had a tool with which to do this, and Foley catheters were issued to him. He made the same complaint on September 15, and was scheduled for a follow-up appointment.

On October 4, 2005, while still at the Byrd Unit, McGiffin was seen by a physician's assistant named Curry, who said that there was no indication for a urethral dilator.  He filed a sick call request on October 23 insisting that he had been told by a urologist named Dr. Kilpeckey [sic] to perform dilation four times a week, but that the physician's assistant had said that the urologist was wrong. He saw Curry the next day, and Curry noted that there was no indication for urethral dilation as no urinary obstruction was present; he also ordered that security confiscate whatever "tool" McGiffin was inserting into his penis.

On November 21, 2005, McGiffin was at the Beto Unit, and saw Dr. Clayton, apparently for an intake exam, and Dr. Clayton referred him to the urology department in Galveston. On March 10,

2006, McGiffin saw Dr. Justin Green at the urology clinic in Galveston.  Dr. Green's impression was a "urethral stricture" and he recommended an appointment in three to four weeks for dilation.

On April 18, 2006, McGiffin was again seen in Galveston for this condition.  The medical records state that McGiffin needed a meatal dilator and Surgi-lube, a sterile surgical lubricant, and that he can dilate himself three times a week.[1]  The next entry in the medical records is dated June 1, 2006, and says that McGiffin is in the clinic for evaluation for a re-referral to Galveston; William Kapela, P.A., stated that an email would be sent to Dr. Green for further guidance and that a follow-up would be done in one week.

On June 9, McGiffin's follow-up appointment was conducted.  At this time, Kapela wrote that McGiffin would be issued catheters and Surgi-lube, and a follow-up would be done in two weeks.

On June 11, McGiffin filed a sick call request that the catheter which Kapela gave him on June 8 had dropped his pain level from a 10 to a 2, but that the rubber catheter was not hard enough to knock the blockage out of the way entirely.  He said that he still needed his tool, or that possibly a doctor could perform a procedure to remove the blockage, but expressed his appreciation for the fact that his pain level had dropped considerably.

Two days later, on June 13, McGiffin was seen at nursing sick call.  Nurse Evans noted that she had spoken with Kapela, who said that they could not provide him with a dilating device and that there was no need to see other providers because McGiffin had an appointment in Galveston and also was able to perform self-catheterization three times per week.

On July 10, McGiffin saw Kapela again.  At this time, Kapela discontinued the catheters and Surgi-lube, instead ordering self-dilation with a thermometer probe cover and Surgi-lube, and stated that he would check on McGiffin's urology appointment. On June 19, McGiffin requested Surgi-gel, and was given three packs.

---

[1]A meatal dilator is a device used to dilate the urethral meatus.

On August 9, 2006, McGiffin was seen at the hospital in Galveston.  Nurse Santos Hernandez wrote that McGiffin denied any pain at that time and said that he had no problems voiding because he uses a probe cover to dilate himself, which he does every other day.  That same day, dilation was performed in the urology clinic.

Back at the Beto Unit, on August 11, McGiffin was seen by Nurse Shirley Huff, stating that he needed supplies for self-catheterization.  She gave him three catheter kits as well as an antibiotic which he had been ordered.  Two weeks later, he was issued seven in-and-out catheters by Nurse Sherry Corson.  On September 17, he received two red rubber catheters and Foley catheter kits.  On September 26, he received a red rubber catheter.  On October 23, he was issued five in-and-out catheters.

On November 1, 2006, McGiffin was again seen in Galveston.  He complained that he was not getting enough catheters.  The nurse noted that McGiffin needed a meatal dilator or catheters, as well as all necessary supplies.  On December 18, McGiffin saw a nurse named Edmond at the Beto Unit, and she have him nine catheters plus two extra in case he ran out.

On February 2, 2007, McGiffin again went to the urology clinic in Galveston.  A history of distal penile stricture was noted, and McGiffin reported that he was using a #14 catheter but thinks that he needs a larger one.  The recommendation that he be given a #16 catheter instead.

McGiffin's name appears on a list entitled "colostomy / catheter," with the dates of January 3, 11, and 25, February 9 and 23, and March 14, all of 2007.  Each time his name appears it says "perm 2X month," meaning that he has a permanent pass for catheters twice a month; the entry for March 14 says "16 fr," referring to #16 catheters.  On March 28, the medical records contain a purchase order an order for a #16 vinyl self-catheter, per the Hospital Galveston order for McGiffin. The next day, McGiffin filed a sick call request (which was actually dated March 22, but scanned on March 29) asking about his catheters being ordered.  The response was that the catheters had been ordered.  This lawsuit was filed on April 19, 2007.

6

Legal Standards and Analysis

The crux of McGiffin's claim is the assertion that the Defendants have been deliberately indifferent to his serious medical needs.  The Fifth Circuit has held that deliberate indifference to a convicted inmate's serious medical needs could state a civil rights violation, but a showing of nothing more than negligence does not.  Norton v. Dimazana, 122 F.3d 286, 291 (5th Cir. 1997); Jackson v. Cain, 864 F.2d 1235, 1246 (5th Cir. 1989).  However, simple disagreement with the medical treatment received or a complaint that the treatment received has been unsuccessful is insufficient to set forth a constitutional violation.  Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985); Norton, 122 F.3d at 293.

Furthermore, malpractice alone is not grounds for a constitutional claim.  Varnado v. Collins, 920 F.2d 320, 321 (5th Cir. 1991).  Negligent or mistaken medical treatment or judgment does not implicate the Eighth Amendment and does not provide the basis for a civil rights action.  Graves v. Hampton, 1 F.3d 315, 319-20 (5th Cir. 1993).  The Fifth Circuit has held that the fact that medical care given is not the best that money can buy, and the fact that a dose of medication may occasionally be forgotten, does not amount to deliberate indifference to serious medical needs.  Mayweather v. Foti, 958 F.2d 91 (5th Cir. 1992).

More pertinently, the Fifth Circuit has held that an inmate who had been examined by medical personnel on numerous occasions failed to set forth a valid showing of deliberate indifference to serious medical needs.  Spears v. McCotter, 766 F.2d 179, 181 (5th Cir. 1985).  It should be noted in this regard that medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference to serious medical needs.  Banuelos v. McFarland, 41 F.3d 232, 235 (5th Cir. 1995).

In Domino v. TDCJ-ID, 239 F.3d 752 (5th Cir. 2001), a inmate who was a psychiatric patient expressed suicidal ideations and the psychiatrist returned him to his cell after a five-minute examination; the inmate committed suicide two and a half hours later.  The Fifth Circuit, in reversing a denial of summary judgment by the district court, stated as follows:

> Deliberate indifference is an extremely high standard to meet.  It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference.  Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985).  Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."  Id.  Furthermore, the decision whether to provide additional medical treatment "is a classic example of a matter for medical judgment."  Estelle v. Gamble, 429 U.S. 97, 107 (1972).  And, "the failure to alleviate a significant risk that [the official] should have perceived, but did not," is insufficient to show deliberate indifference.  Farmer v. Brennan, 511 U.S. 825, 838 (1994).

Domino, 239 F.3d at 756.

The case of Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999), presents an illuminating picture of what does and does not constitute deliberate indifference to serious medical needs.  In that case, the plaintiff Eugene Stewart was incarcerated in May of 1993, at which time he was 67 years old and suffering from numerous ailments, including hypertension, arthritis, gout, and heart disease.  In August of 1994, he was admitted to the hospital for treatment of swollen legs, a possible indication of congestive heart failure.  He was treated for five days and then released, but the next day, the treating physician, Dr. Dial, was notified that Stewart had a large decubitus ulcer (i.e. a bedsore) on his back.  He ordered cleansing of the ulcer, treatment with antibiotics, and placement on the sick call list; however, it was not clear why such a wound was not discovered during Stewart's stay in the hospital, rather than after his discharge.

Stewart was readmitted to the prison hospital on September 6, 1994, this time under the care of Dr. Kim.  She took cultures from the ulcer, debrided the wounds, and administered antibiotics and IV fluids.  Dr. Kim also ordered that the dressings be changed three times a day and that Stewart be repositioned every three hours, but acknowledged that due to staffing problems, the nurses sometimes did not carry out the doctor's orders.

Stewart's ulcers did not improved and he was transferred to a non-prison hospital for consultation and treatment.  When he returned, Dr. Kim did not follow the free-world physician's advice to transfer Stewart to another facility for physical therapy.  Instead, Dr. Kim ordered that

8

Stewart be kept out of bed as much as possible and that the nurses move his extremities.  She also transferred him to the care of another physician, Dr. Knutson.

Dr. Knutson treated Stewart's ulcers with medication, ordered that the dressings be changed twice a day, and that Stewart be repositioned every hour.  He also checked the wounds periodically and ordered that Stewart get out of bed for extended periods of time.

However, Dr. Knutson conceded that he often did not read the nurses' notes, which said that Stewart had an infection from a catheter, and did not prescribe antibiotics.  He did not see Stewart over the Thanksgiving four-day weekend, and saw him next on November 28, 1994, at which time Stewart appeared like he was going to die.  Dr. Knutson tried to treat Stewart at the prison hospital but ultimately transferred him to the University of Mississippi Medical Center, where the attending physician stated that Stewart had "the worst bedsores she had ever seen."  Stewart died on December 7, 1994.

Stewart's family sued Drs. Dial, Kim, Knutson, and Russell, the medical director at the prison facility.  The district court granted summary judgment for the physicians, and an appeal was taken.

On appeal, the Fifth Circuit affirmed the grant of summary judgment.  The Fifth Circuit concluded that there was no probative evidence that any of the doctors denied, substantially delayed, or intentionally interfered with treatment.

The dissenting opinion argued that Stewart had not received even rudimentary medical care. The dissent asserts that Dr. Dial was told the day after Stewart was discharged from hospital in August of 1994 that he had developed a 25-centimeter (10-inch) stage IV decubitus ulcer, which Dial apparently had not noticed in five days of treating him.  Dr. Dial prescribed a regimen of cleansing, dressing, and antibiotics, but never checked to see if his orders were being carried out or if they were effective.  Nor did Dr. Dial review the nurses' notes.

According to the dissent, Dr. Kim found that Stewart had developed multiple decubitus ulcers including a "very deep infection," and gave orders for their treatment.  However, the dissent contended that Dr. Kim knew full well that the facility was too understaffed to carry out her orders,

9

but made no effort to carry out a recommendation that Stewart be transferred to a facility where he could receive proper treatment.  Finally, the dissent said that the nurses charted numerous symptoms of infection, but Dr. Knutson did not review these notes; although Dr. Knutson observed after Thanksgiving that Stewart had a urinary tract infection, he did not prescribe any antibiotics. Nonetheless, the dissent did not carry the day; the majority concluded that the doctors had provided "active treatment" for Stewart's ailment and that there was no material fact issue to support the requisite deliberate indifference necessary for liability.

Similarly, the evidence in the present case shows that McGiffin received active treatment for his condition.  He was examined on numerous occasions by medical professionals and was given multiple referrals to the urology clinic in Galveston.  He was repeatedly ordered catheters with which to alleviate the blockage and advised that he could wash them, but he simply did not believe this to be true.  Although it is clear from his testimony, as well as the medical records, that there were occasions when he did not receive the supplies he needed for a few days, it is equally clear that these interruptions in care were not caused by deliberate indifference to his serious medical needs. McGiffin simply has not shown that the medical staff refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.  Domino, 239 F.3d at 756.  As noted above, even negligence or malpractice would not rise to the level of a constitutional violation.  Graves, 1 F.3d at 319-20.  The medical records show that the physician's assistant at the Byrd Unit had noted that there was no blockage, which notation in the medical records may have caused McGiffin some difficulty in obtaining supplies until he went to Galveston and the blockage was confirmed; this also does not show that any of the Defendants in this case were deliberately indifferent to his serious medical needs.

This is true even though the Court does not in any sense doubt McGiffin's testimony that he experienced pain, which at times was severe.  The Fifth Circuit has held that complaints by prisoners for negligence on the part of prison officials, even where serious injury occurs, do not set out a valid

claim under the Civil Rights Act even if such complaints could be valid under state law.  *See* Bowie v. Procunier, 808 F.2d 1142 (5th Cir. 1987).

While McGiffin points to occasions in which the care which he received may not have been optimal, as for example the incident in which the wrong tool was ordered, these incidents also do not demonstrate deliberate indifference to his serious medical needs.  As stated above, negligence and malpractice do not rise to the level of deliberate indifference and do not set out constitutional claims.  Stewart, 170 F.3d at 534; Graves, 1 F.3d at 319-20.  The medical care which McGiffin received may not have been "the best that money can buy," *see* Mayweather, 958 F.2d at 91, but neither does the complaint about it meet the "extremely high standard" which the Fifth Circuit requires for a showing of deliberate indifference.  Domino, 239 F.3d at 756.  McGiffin's complaint is therefore without merit

## Conclusion

28 U.S.C. §1915A requires that as soon as practicable, district courts must review complaints wherein prisoners seek redress from governmental entities or their employees.  Section 1915A(b) requires that upon review, the court shall identify cognizable claims or dismiss the complaint or any portion thereof if the complaint is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.

The term "frivolous" means that a complaint lacks an arguable basis in law or fact; a complaint is legally frivolous when it is based upon an indisputably meritless legal theory.  Neitzke v. Williams, 490 U.S. 319, 325-7 (1989).  A complaint fails to state a claim upon which relief may be granted if as a matter of law, it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.  Neitzke v. Williams, 490 U.S. 319, 327, (1989), *citing* Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); *see also* Blackburn v. City of Marshall, 42 F.3d 925, 931 (5th Cir. 1995).

In this case, McGiffin's complaint lacks any arguable basis in law and fails to state a claim upon which relief may be granted.  Consequently, his lawsuit may be dismissed as frivolous under

28 U.S.C. §1915A(b).  *See generally* <u>Thompson v. Patteson</u>, 985 F.2d 202 (5th Cir. 1993).  It is accordingly

  ORDERED that the above-styled civil action be and hereby is DISMISSED with prejudice as frivolous.  28 U.S.C. §1915A.  It is further

  ORDERED that any and all motions which may be pending in this civil action are hereby DENIED.

  So **ORDERED** and **SIGNED** this **13** day of **February, 2008.**

_____

JUDITH K. GUTHRIE

UNITED STATES MAGISTRATE JUDGE

12
